JOHN H. HOWARD, PLAINTIFF IN ERROR, v. STEPHEN M. IN-
GERSOLL; JOHN H. HOWARD AND JOSEPHUS ECKOLLS, PLAIN-
TIFFS IN ERROR, v. STEPHEN M. INGERSOLL.

In 1802, when Georgia ceded her back lands to the United States, she had jurisdic-
tion over the whole of the Chattahoochee River, from its source to the thirty-first
degree of north latitude.
The rule is that, where a power possesses a river, and cedes the territory on the other
side of it, making the river the boundary, that power retains the river, unless there
is an express stipulation for the relinquishment of the rights of soil and jurisdiction
over the bed of such river.
When Georgia ceded to the United States all the land situated on the west of a line
running along the western bank of the Chattahoochee River, she retained the bed
of the river and all the land to the east of the line above mentioned.
The river flows in a channel, between two banks, from fifteen to twenty feet high,
between the bottom of which and the water, when the river is at a low stage, there
are shelving shores, from thirty to sixty yards each in width.
The boundary-line runs along the top of this high western bank, leaving the bed of
the river and the western shelving shore within the jurisdiction of Georgia.

THESE two cases were argued and decided together.   The
suits related to the same tract of land and the rights of the
same parties, although they came up from different States.
The first, which is referred to in the opinion of the court as No.
121, was an action on the case brought by Ingersoll in the Cir-
cuit Court of Alabama (State court) to recover damages for
the wrongful obstruction, by Howard, of the Chattahoochee
River, whereby the waters of that stream were backed in such a
manner as to overflow Ingersoll's land and obstruct the use of
his mill.   This mill was built between the high bank of the
river and low-water mark, as it was called, so that when the
water was high it was overflowed; but when the water was low,
it was on dry ground.   At such times, it was worked by a race
fed from the river by means of a wing dam.   Howard built a

dam below, which backed the water upon the mill, and impeded its operations. On the trial of this cause the jury returned a verdict in favor of Ingersoll for the sum of $4,000. The cause was carried to the Superior Court of Alabama, where the judgment was affirmed; whence it was brought to this court under the 25th section of the Judiciary Act.

No. 131. { HOWARD & ECKOLLS, Plaintiffs in error,
*v.*
INGERSOLL.

This case was brought, by writ of error, from the Circuit Court of the United States for the District of Georgia. Howard & Eckolls, the builders of the dam, brought a suit against Ingersoll in the Superior Court of Muscogee county, Georgia, to recover damages for an illegal entry upon their land covered with water, and fishing thereon. The jury found a verdict for the plaintiffs for the sum of $600. A bill of exceptions brought the case up to this court.

After these general observations upon the two cases, let us now take them up separately; and first of

No. 121. { HOWARD, Plaintiff in error,
*v.*
INGERSOLL.

It has been always stated that this case was brought from the Supreme Court of Alabama. The bill of exceptions, which was taken on the trial of the cause in Russell Circuit Court, was as follows:

*Bill of Exceptions.* On the trial of this cause the plaintiff (Ingersoll) produced a patent from the United States to himself, dated in 1802, to fractional section No. 11, township 7, range 30, and proved title in himself to lots 1, 2, 3, and 4, in the town of Girard, lying in Russell county, Alabama, and specifically described in some of the counts of the declaration; said land has for its eastern boundary the State of Georgia, and is immediately west of the Chattahoochee River, on the bank thereof. This river has, for the most part, high bluff banks; but in some places the banks are low, and the adjacent lands on either side (where they are low) are subject to inundation, for nearly a mile out of the banks. Immediately at the plaintiff's lands and lots there are banks of the river from fifteen to twenty feet high, and very abrupt, and are high on both sides, and above and below, for considerable distances. The abrupt and high banks, however, do not extend down to the water's edge at ordinary low water. The bed of the river at this point is about two hundred yards wide from bank to bank; and by the bed is meant the space between these abrupt and high banks, and is composed of rocks

Howard et al. *v.* Ingersoll.

and slues among the rocks from one side to the other; ordinary low water and extreme low water together prevail for about two thirds of the year, during which time the river is confined to a channel about thirty yards wide, leaving the bed of the river as above described, exposed on each side of this channel, from thirty to sixty yards. Immediately under the western abrupt and high bank, and within the latitude of the north and south boundary line of plaintiff's land, said lines being drawn down to the water's edge, and in the bed of the river, as above described, east of said western abrupt and high bank, the plaintiff erected a mill previous to 1842, and continued the possession and use thereof until overflowed by defendant's dam. The place on which said mill was situated was covered with water in ordinary high water, but was bare and dry in ordinary low water.

To supply his mill with water the plaintiff had erected a wing dam, which ran in a north-east direction into the river, and supplied his mill with water at all seasons, and diverted a portion of the stream to the said mill, which passed again into the river above defendant's dam, and he, plaintiff, had blown out rock to give room to his mill-wheel.

It was further proved, that, in 1845, the defendant erected a dam across the river, about three hundred yards below the plaintiff's mill, and opposite the city of Columbus, Georgia. The said dam was four to five feet high, and at ordinary low water backed the water on plaintiff's mill, so as to prevent its working; in high water the said dam made no difference, as the water was level above it and on both sides of it. The plaintiff further proved the value of his mill and the injury he sustained. The defendant introduced in evidence the act of cession of the State of Georgia to the United States; the Constitution of the State of Georgia; an act of the State of Georgia granting to the city of Columbus, the right to lay off lots on her river boundary, running across the Chattahoochee River, to high-water mark, on the western bank of said river. All of which evidence, being printed in the public acts, are to be read and considered in full as part of this bill of exceptions.

The defendant also offered in evidence an authenticated deed to him, from the city of Columbus, granting him said lots, running across the river, and authority to erect the dam across the river; which original deed and accompanying plat, it is agreed, may form a part of this bill of exceptions, and may be exhibited as such. The plaintiff's land was situated at a point of the river where there were falls or rapids, and where it was not navigable, and that it was far above tide-water, and a fresh-water stream, and between Miller's Bend and Cochei Creek.

The defendant's dam raised the water to a point on the western high bank which [is] dry at ordinary low water. One witness proved that he never knew a sheriff or constable of Georgia to come over on the western bank to serve any writ, or process, or other official act, and stated that he, the witness, had good opportunity to know if any such thing had been attempted, as he had lived on the western bank for ten years.

At the place at which plaintiff's mill was erected the summit of the bank was never overflowed, even at the highest stages of the river, the water of which always remained several feet below it. The plaintiff gave in evidence to the court, which was not allowed to go as evidence to the jury, although requested by plaintiff, acts of the State of Georgia, conveying authority to the commissioners to negotiate the cession of territory from Georgia to the United States, and also the act of Georgia ratifying said cession ; all of which may be read from the public acts. The court charged the jury, that one passing from Georgia to Alabama, across the Chattahoochee River, at ordinary low water, would be upon the bank as soon as he left the water on the western side, although an inappreciable distance from the water, and that the line described in the treaty of cession from Georgia to the United States, as running up said river, and along the western bank thereof, is the line impressed upon the land by ordinary low water ; and if they believed the plaintiff's mill was west of that line, and defendant's dam backed the water so as to obstruct the operation of said mill, the plaintiff was entitled to recover ; to which charge the defendant excepted.

The defendant asked the court to charge the jury, that if the bank of the river was ordinary low-water mark, the plaintiff had no right to the use of the water at that stage ; which charge the court refused ; to which defendant excepted, and prays his exceptions to be signed and sealed, and made part of the record of this cause, which is accordingly done in term time.

J. J. WOODWARD. [L. S.]

The judgment of the Circuit Court was affirmed by the Supreme Court of Alabama, and brought to this court to be reviewed, under the 25th section of the Judiciary Act.

No. 131. { HOWARD & ECKOLLS, Plaintiffs in error,
*v.*
INGERSOLL.

This action was brought by way of petition by Howard & Eckolls, the owners of the dam below, against Ingersoll, the owner of the mill above, for entering the close (ground covered with water) of the petitioners and fishing. Ingersoll removed

the cause into the Circuit Court of the United States, where it was tried in July, 1850. The court having refused to charge the jury as prayed for by the plaintiffs, they brought the case to this court, although there was a verdict in their favor for $600 damages.

The following is the bill of exceptions:

On the trial of this cause the plaintiffs proved, by the articles of cession, dated on the 16th day of June, 1802, between the United States and Georgia, that the boundary-line between Georgia and the Territory, now State of Alabama, was a line beginning on the western bank of the Chattahoochee River, and running along the western bank thereof. And did further prove, by competent testimony of witnesses, both for the plaintiffs and on the part of the defendant, that at the part of the said River Chattahoochee, where the closes in the said declaration mentioned are situated, the said river (not being a tide-water, and not being navigable) is considerably reduced at its lowest state, especially in droughts, being quite narrow at such state, particularly in some places where it is confined by rocks projecting from the opposite sides of the river, and in other places spreading out more at large. That between the water in this state of the river, and a high and perpendicular bluff on the western or Alabama side, the distance varies, according to one witness, from 30 to 100 yards; according to another, the bluff banks are high and precipitous; at some places they are 30 feet, at others 100, and again 150 feet from the main channel; by another, at the foot of the bluff bank is a flat space from 50 to 150 feet wide, between ordinary water mark and the bluff bank; from very low-water mark to the bluff bank is more than 50 to 150 feet. According to another witness it is from 100 to 120 feet from the bluff bank to medium water mark, and from 80 to 100 feet from medium water mark to low-water mark; that this intermediate space is a flat or bottom land, gradually descending from the base of the bluff to the water; that in places upon this flat there is a growth of shrubbery, and some trees, such as pines, gums, oaks, willows, alders, poplars, &c.; that the growth on this flat would be liable to be destroyed if the flat were long or often overflowed; that there is a road or cart-way underneath this bluff, a grist-mill, one post of which stands in the water, (the water approaching very near the bluff at that point,) and there being just room between the mill and the bluff for the above road to pass. There is also a saw-mill, (but not on the closes in the declaration mentioned,) and a cotton-gin factory under the bluff on this flat; and a small portion of it has at times been cultivated. That in the ordinary winter state of the river the water covers this

flat about half way to the bluff, to the base of a bank or ridge, of sand and gravel, having an inclination of about forty-five degrees; that in very full states of the river, that is, in freshets, the water covers the flats, reaching to, or nearly to, the bluff, and in the freshet of 1840, known as the Harrison freshet, it extended twelve feet up the base of the bluff; that the extent to which this flat is covered with water varies with the height of the freshets in said river, it being all dry land at the lowest state of the river, and a portion of it being always, except in high freshets, uncovered with water; that it is only in the full state of the river that the water overflows the sand-bank or ridge before mentioned,

Whereupon the plaintiffs prayed the court to instruct the jury that the true interpretation of the said article of cession in the year 1802, between the United States and Georgia, requires the boundary line between the State of Georgia and the Territory, now State, of Alabama, to be drawn on and along the western bank of the Chattahoochee River. And that wherever the jury may find that bank to be, the jurisdiction and limits of the State of Alabama must terminate, and cannot pass beyond that line to the eastward of the same, but that all east of said line, whether it be land or water, is included within the limits and jurisdiction of Georgia, and no grant from the United States or the State of Alabama can confer title to any part of the same, either directly or indirectly, either by virtue of the said grant, or as an incident to the same.

Which instruction the said court refused to give, except subject to this modification, to wit, that the articles of cession was an instrument, the interpretation of which belonged to the court and not to the jury, and gave the said instruction subject to the said modification; and moreover instructed the jury that, by the true construction of those articles of cession, the boundary-line between the State of Georgia and Alabama was to be drawn on and along the western bank of the Chattahoochee River at low-water mark, when the river was at its lowest state.

To which refusal and instruction the plaintiffs except, and pray this bill of exceptions to be signed, sealed, and enrolled, which is done this fifth day of July, 1850.

JNO. C. NICOLL, [L. S.]
*District Judge for the District of Georgia.*

These cases having been brought before this court upon these two bills of exceptions, were argued by *Mr. Johnson* and *Mr. Berrien*, for the plaintiffs in error, and *Mr. Coxe*, for the defendant in error. The reporter gives the following notes of the argument of Mr. Berrien, which have been kindly revised by him,

and having no notes of Mr. Coxe's argument, begs to refer the reader to the report of the Alabama case, in 17 Alabama Reports, 780; where will be found the argument of the counsel for Ingersoll, and also the opinion of the court as delivered by Dargan, C. J.

*Mr. Coxe* contended that this court had no jurisdiction over the Alabama case, because Ingersoll claimed under a title derived from the United States, and the judgment was in his favor and not against its validity, as required by the 25th section of the Judiciary Act.

*Mr. Berrien*, for plaintiffs in error.

I will consider, — 1st. The question of jurisdiction; 2d. That of boundary.

*Jurisdiction.* This question arises under the 25th. section of the Judiciary Act of 1789, (1 Stat. at Large, 85.) The object of the section is to give appellate jurisdiction to the Supreme Court of the United States from decisions of the State courts, in all cases in which it is necessary to determine (I use the words of the act) the validity of a treaty, of a statute, or an authority exercised under the United States, or the construction of any clause of the Constitution or of a treaty, or of a statute of, or commission held under, the United States. No further detail is necessary to present the question of jurisdiction than to state, that the United States and Georgia both claimed lands lying east and west of the River Chattahoochee; that the United States exercised jurisdiction over them by organizing the Territory of Mississippi, recognizing in the act the claims of Georgia, saving her rights, and providing for the appointment of commissioners to adjust these conflicting claims, (Act of 1798, 1 Stat. at Large, 549; Act of 1800, 2 Stat. at Large, 69); that Georgia acquiesced in this proposal; that commissioners were appointed, and articles of cession defining the boundary between the territory claimed by the United States and by Georgia were duly executed and confirmed. On the true ascertainment of that boundary the rights of the parties in these cases depend.

Georgia ceded to the United States all her right, title, &c. to all lands lying west of that line. The United States ceded to Georgia all their right, title, &c. to all lands lying east of it. The plaintiffs in error, deriving their title from Georgia, claimed under her original title, modified as it was by these articles, and therefore claimed also under the United States, that is to say, under the cession to Georgia by the United States of all their right, title, &c. to all lands lying east of a line running on and along the western bank of the River Chattahoochee. They

claimed the whole river, the shore or flats between the margin of the water, and the bank, and founded their claim on the legislative grant of Georgia and these articles of cession by the United States.

The question in controversy between the parties was, What was the line which they established? In No. 121 the court decided it to be "the line impressed upon the land by ordinary low water." In No. 131 it was declared to be "a line drawn on and along the western bank of the Chattahoochee River at low-water mark, when the river was at its lowest state."

These decisions were therefore adverse to the claim set up by the plaintiffs in error under the act of cession by the United States, denying their exclusive right to the river in every stage, to the shores and flats between the water's edge and the base of the bank, and to its inner edge or slope. The validity of this claim it is not material to consider on this question of jurisdiction. It is sufficient that it was made in the Supreme Court of Alabama, that it was made under the cession from the United States to Georgia, from whom they derived title, and that that court decided against it. In the construction of the 25th section of the Judiciary Act, this court has said, "it must appear that the right, title, &c., under a statute or commission of the United States, was specially set up by the party claiming the same in the State court, and the decision be against the same." Montgomery *v.* Hernandez, 12 Wheat. 129. But the court has also said that it is "not necessary that the question shall appear in the record to have been raised, and the decision made in direct and positive terms, *ipsissimis verbis ;* it is sufficient if it appear that the question must have been varied, and must have been decided, to induce the judgment." 1 Stat. at Large, 86, in notes and authorities cited. Now the plaintiffs claimed under Georgia. She had restricted her limits, having, by the act of cession, withdrawn them from the Mississippi to the line agreed upon in those articles. To determine on the validity of her grant it was necessary to decide where that line was, and this depended on the construction of the articles of cession, — the joint act of the United States and Georgia. Again, the bill of exceptions states, that at the point to which this controversy applies the river is bounded by banks from fifteen to twenty feet high; that the bed of the river, the space between these banks, is about two hundred yards wide; that at ordinary low water the channel is about thirty yards wide, leaving from thirty to sixty (or rather eighty) yards of flats exposed on each side between the channel and banks; that the mill of defendant in error was placed below the western high bank in the bed of the river, and that the site of the mill was covered with water in ordinary high

water, but was bare and dry in ordinary low water. The plaintiffs claimed the western high bank, including the whole river, the flats, and the inner face of that bank, and that this was the line defined in the act of cession made by the United States. If this claim was affirmed, the defendant in error was a trespasser, and this judgment could not have been rendered. It was disaffirmed, and so disaffirming it the court denied the validity of the act of cession, under which plaintiff claimed, or they gave a construction to those articles adverse to his claim, and in either case the appellate jurisdiction of this court is manifest.

But the learned counsel has yielded the question of jurisdiction by conceding, as he has done, that these records "present but a single question, viz., what is the true construction of that part of the compact between the State of Georgia and the United States," &c. Surely it belongs to this court to decide, in the last resort, on the construction of a compact entered into by commissioners of the United States acting under the authority given by a statute of the United States.

But again, the learned counsel yields the question of jurisdiction by contending, as he may rightfully contend, that these actions "were local in their character," for then, especially in the Alabama case, No. 121, in which alone the jurisdiction of this court is contested, it became necessary for the Supreme Court of Alabama to decide that the *locus* of the alleged trespass was within the limits of that State, which could only be done by giving a construction to the act of cession, and thus deciding the locality of the line of boundary between Georgia and Alabama, which they prescribe. Without this, judgment could not have been rendered for the plaintiff in the court below.

The question of jurisdiction is submitted. I proceed to examine the question of *boundary*.

Its decision depends on the construction to be given to the following words in the act of cession: "West of a line beginning on the western bank of the Chattahoochee River, where the same crosses the boundary-line between the United States and Spain, running up the said River Chattahoochee, and along the western bank thereof"; and on the mutual cession of the United States and Georgia, — the United States ceding to Georgia all their right, title, &c. to the territory lying east of that line, and Georgia ceding to the United States all her right, title, &c. to the territory lying west of it. That line, then, limits the precise boundary between the contracting parties. The United States have relinquished all claim to territory lying east of it; Georgia has in like manner relinquished her claim to territory lying west of it.

But the learned counsel supposes that this cession by the

33 *

United States is valueless, because the commissioners of the United States exceeded their power in making it; that they were limited, by the act creating the commission, to an acceptance of a cession from Georgia; of a cession of lands lying west of the Chattahoochee, and were not authorized to cede to Georgia the right, title, &c. of the United States to territory lying east of that line.

To give to the learned counsel the whole benefit of his argument, let it be conceded that the commissioners of the United States exceeded their powers in making the cession to Georgia, as the commissioners of Georgia certainly did exceed their powers in ceding to the United States all the right, title, &c. of Georgia to the territory lying west of a line drawn on the bank of the Chattahoochee, for they were limited to a cession of the territory lying west of a line seventy miles west of the Chattahoochee. Marb. & Craw. Dig. Laws Geo. Both parties, then, exceeded their powers. With a view to the amicable adjustment of the controversy they assumed to themselves powers which were not conferred upon them. What then? The learned counsel is aware that the subsequent ratification of the acts of an agent who has exceeded his powers is equivalent to the original grant of the powers which he has exercised. Now Georgia and the United States have acquiesced in the settlement of the controversy made by the articles, — Georgia by an express act of legislation, the United States by repeated acts, resulting in the organization of the Territory of Alabama and her subsequent admission as a State.

We enter, then, upon the consideration of the articles of cession, having established our claim to the full benefit of the mutual cession of the United States and Georgia. Under these articles the plaintiffs in error claim that the boundary which they describe is a line beginning on the western bank of the Chattahoochee, running up the river and along the western bank thereof, meaning thereby the elevated bank, which, with that on the eastern side, contains the river in its natural channel when there is the greatest flow of water.

The line is to begin on the bank, to run up the river and along the bank. It is to run up, to indicate its direction; on and along the bank, to mark its locality. The line thus clings to the bank.

What, then, is the western bank? Is it the margin of the river, — the varying line marked by the contact of the water with the land, in its different stages of high, low, ordinary high, and ordinary low, or extreme low water, and which of them? Or is it the bank of earth which, with that on its opposite side, contains the river in its natural channel when there is the great-

est flow of water? This inquiry may be considered, — 1st. Technically; 2d. With a view to the probable intention of the parties, as that is to be inferred from the statutory history of the transaction, taken in connection with the character of the river and the consequences to result from either construction.

Before entering upon this inquiry, there are certain terms which will occur in the progress of this discussion, to which it is necessary to affix a definite meaning.

We are seeking to ascertain the meaning of the expression, the *bank* of a *river*. What, then, is a river? What are its banks? A river is defined to be a body of flowing water, of no specific dimensions, larger than a brook or rivulet, less than a sea — " a running stream, pent in on each side by walls or banks." Woolwich on Sewers, 51; Rutherf. 90, 91; vide etiam Livingston *v.* Morgan, 6 Mart. R. 19.

A river is said to be " pent in by walls or banks," and is thus contradistinguished from a sea or an ocean, which encompasses the land, rather than is encompassed by it. A river consists of water, a bed, and banks. The bed or channel is the space over which the water flows, — " the hollow bed in which waters flow." Nautically, the term channel is opposed to shallows; the former indicating the deeper portion of the stream, that along which vessels pass. In ordinary phraseology, the bed or channel is the hollow space between the banks which bound the river. It is usual in cases of this sort to refer to lexicographers.

A bank is defined to be " a steep declivity, rising from a river, lake, or sea." Webster, def. Bank.

*Ripa extremitas terræ, quæ aqua alluitur.* And again: *Ripa recte definitur id quod flumen continet naturalem vigorem cursui sui tenens.* Bayley's Latin Lexicon, def. *Ripa.*

Bouviere says: " Banks of rivers contain the river in its natural channel when there is the greatest flow of water." Bouv. L. Dict., def. Banks of Rivers; Morgan *v.* Livingston, ante.

Mr. Justice Story defines shores or flats to be the space between the margin of the water in a low stage, and the banks which contain it in its greatest flow, thus distinguishing flats or shores from banks. Thomas *v.* Hatch, 3 Sumn. 178.

Chief Justice Parsons, citing Lord Hale's definition of the term shores, considers it as synonymous with flats, and therefore substitutes this latter expression. Storer *v.* Freeman, 6 Mass. R. 438, 439. His opinion in that case confirms the position for which we are contending. Chief Justice Parker holds a similar doctrine. Hatch *v.* Dwight, 17 Mass. R. 289, 298.

Chief Justice Marshall says: " The shores of a river border on the water's edge." Handley's Lessee *v.* Anthony, 5 Wheat. 374, 385.

If the shore borders on the edge of the water, it must extend outwards to the bank, and therefore cannot be the bank, which, in certain stages of the river, it separates from the water's edge.

A river, then, consists of water, a bed, and banks; these several parts constituting the river, the whole river. It is a compound idea; it cannot exist without all its parts. Evaporate the water, and you have a dry hollow. If you could sink the bed, instead of a river you would have a fathomless gulf. Remove the bank, and you have a boundless flood. He who owns the river must therefore own the water, the bed, and the banks; since these are parts of that which belongs to him — the elements which constitute the river, of which he is owner.

1. *The question of boundary considered technically.* I proceed to consider, first, — the language of the articles of cession; the description of the river in the record; the position of the mill of the defendant in error.

The articles of cession are found in Hotchk. Dig. Laws Geo. 83. Its language is familiar to the court. It requires the line to run on and along the western bank.

The description of the river is found in Howard *v.* Ingersoll, Rec. p. 5; Howard & Eckolls *v.* Ingersoll, Rec. p. 4. It is described as bounded — "pent in" — by high banks, up to which it sometimes flows, being two hundred yards wide, while at others it is reduced to a channel of thirty yards in width.

The eastern boundary of defendant's land is the State of Georgia. Howard *v.* Ingersoll, Rec. p. 5. His mill-site is in the bed of the river, and is covered with water at ordinary high water. It is not on the high bank, nor at its base; for a cart-road passes between the mill and the bottom of the bank. Howard & Eckolls *v.* Ingersoll, Rec. p. 4.

The Supreme Court of Alabama decided that this mill-site was within the State of Alabama, *in al. verba*, that a mill-site in the bed of the river, between which and the bank there was a cart-road, and which mill-site was overflowed at ordinary high water, was west of a line drawn on and along the western bank of the Chattahoochee River.

The grounds of that decision it is my duty to examine. It rests —

1. On the consideration of convenience.

2. On cases relative to riparian rights, as calculated to show that the term bank may be considered as equivalent to low-water mark.

3. On the supposed analogy of the case of Handley's Lessee *v.* Anthony, to this case.

A brief remark on each of these. To the argument of convenience, I might safely reply in the language of the maxim,

*Cujus est dare, ejus est disponere.* Georgia yielded to the United States, almost gratuitously, the vast domain, which now constitutes the States of Alabama and Mississippi. She had a perfect right to prescribe the limits of her cession, and to consult her own convenience in determining them. But what is the inconvenience? It is said, it would be burdensome to the citizens of Alabama, to answer in the courts of Georgia for offences committed on the western margin of the Chattahoochee River. But this would be true also of the Flint, Ocmulgee, or any of the other great rivers of Georgia. The inconvenience should be considered before the act is committed. But the Supreme Court of Alabama was influenced, also, by a consideration of the convenience of Georgia, and decided to divest Georgia of all that part of the bed of the river which lies between the foot of the bank, and low-water mark, because it would be inconvenient to her to exercise jurisdiction over it. Why more so than over the eastern side of a river which, according to the decision of the Supreme Court of Alabama, is, for nine months of the year, only thirty yards wide?

This argument of convenience will, however, be considered hereafter in examining the case of Handley's Lessee *v.* Anthony.

I proceed with the consideration of the opinion of the Supreme Court of Alabama.

In commenting on the decision of the court in Hatch *v.* Dwight, ante, and quoting the words of Chief Justice Parker, who says, "the owner may sell the land without the privilege of the stream, as he will, if he bounds his grant by the bank," the Supreme Court of Alabama proceeds as follows:—

"Now, I admit that if the grant be limited to the bank of the river, the land covered by the water will not pass by it, that is, the bed of the river will not be granted; but we consider it well settled, that if land be granted on a running stream, not navigable, and in which the tide does not ebb and flow, and the words used to designate the boundary be the river, or the bank of the river, then the grant will extend to the middle of the stream, unless there be some other expression used, or some other circumstance, showing that the parties did not intend that the grant should extend *ad filum aquæ.*"

Now, with great respect to the Supreme Court of Alabama, I am utterly unable to distinguish, between a grant which is "limited to the bank of a river," and one in which "the words used to designate the boundary" are "the bank of the river." I have supposed that the boundary of a grant was the limit of the grant, and that was to be ascertained by "the words used to designate" it, and yet the Supreme Court of Alabama, admitting that a grant, which is limited to the bank of a river,

must stop at the bank, nevertheless decides that a grant, in which the words used to designate the boundary, are the. bank of the river, will extend *ad filum aquæ*, to the middle of the river, and proceeds to determine that the defendant's grant, which is bounded by the bank, extends to ordinary low-water mark, and includes the site of his mill, which is in the bed of the river, separated from the bank by a cart-road, and overflowed at ordinary high water.

I submit to your honors that the rights of the plaintiffs in error cannot be sacrificed; that the boundary of the State of Georgia cannot be removed from the permanent bank, on and along which it was to run, by this process of reasoning. In commenting on the case of Handley's Lessee *v.* Anthony, the Supreme Court of Alabama say: "But Judge Marshall, who delivered the opinion, did note that the word river and not bank, was used, hence it is supposed that if the term bank had been used instead of river, the court would not have held low-water mark to be the line ; but I think all must admit that the river is inseparably connected with the bank, even if the bank be not included within the legitimate meaning of the term river, and being thus connected, the bank begins where the water touches the land, and we can, therefore, keep within the legitimate meaning of the term bank, and fix the line at low-water mark."

Now this is to assume the whole question in controversy, — to assert that the uncovered portion of the bed of a river, that which is left bare by the retiring waters, constitutes its bank, although the very day after such a decision had been pronounced, what is thus denominated a bank should resume its proper character of a bed, and be covered by the waters of the river in their fuller flow. And the assumption is made in direct opposition to authority, which makes the bank of a river to be part of the river, not a distinct thing, "inseparably connected" with it, but part and parcel of the river itself — one of the elements of that compound idea, which is expressed by the term river, indispensable to its existence. Who can conceive the idea of a river without banks? As I have before said, such a body of flowing water would not be a river, but a boundless flood. Hence, in the language of authority, a river is said to consist of water, bed, and banks, "inseparably connected," indeed, but so connected as part and parcel of one great whole, the river.

The argument of the Supreme Court of Alabama makes the bed of the river, (that portion of it which is left bare at low water,) its bank, while the real bank, that by which the waters of the river are "pent in," in their fuller flow, is divorced from all connection with the river, of which we have seen that

it constitutes an essential part. And again, it is a mere assumption of the question in controversy, for, if bowing to the authority of that high tribunal, we were to admit that because the river and the bank are inseparably connected, the bank must begin where the water touches the land, it would no more follow that this rule was to be applied in the lowest than in the highest or medial state of the river.

But the court proceeds. Having admitted the position stated by Judge Parker, in Hatch *v.* Dwight, that " the owner of land (lying on a stream) may sell the land, without the privilege of the stream, as he will if he bounds his grant by the bank," and *uno flatu* affirmed, that in a grant of lands so situated, in which " the words used to designate the boundary" are the bank, will extend to the middle of the stream, thus making a distinction not obvious to ordinary intelligence, between a grant, which is bounded by a bank, and one, in which the bank is designated as the boundary, they declare, — " It may, however, be safely said, that when a private grant is bounded by the bank, or a running stream, in which the tide does not ebb and flow, no well-considered case can be found that limits the grant short of low-water mark, unless there are other words or expressions used in the deed, showing that the parties did not intend that the grant should extend to low-water mark," — thus plainly contradicting the admission previously made in commenting on the case of Hatch *v.* Dwight. Now without insisting on this recalled admission, I venture to submit to your honors, looking to the fact, that the defendant's eastern boundary is the State of Georgia, whose western boundary is a line drawn on and along the western bank of the Chattahoochee; that no surveyor's chain, acting under the authority of the United States, or Alabama, has ever been stretched east of that permanent or elevated bank. Looking to these facts, I venture to submit, nay, even to affirm, that no well or ill-considered case can be found, (that which we are considering alone, excepted,) which would extend the defendant's grant one inch beyond that line. It is so bounded by its express terms, and no intendment can carry it further. The doctrine of riparian rights can have no place here. These are accessory, incidental to the principal grant; but both the principal and its incident must apply to lands within the jurisdiction of the granting power.

The defendant's grant can neither directly or by intendment extend one inch beyond, and eastward of a line drawn on and along the western bank of the Chattahoochee, for then it would pass into the jurisdiction of another sovereignty. Since, as well by virtue of her original title, as by the express cession of the United States, all east of that line belongs to Georgia.

I will now examine the case of Handley's Lessee v. Anthony, for the purpose of determining the supposed analogy of that case to this.

Two things are there decided:

1. That a tongue of land projecting from the main land of Indiana, between which and the main land there is a narrow channel made by the waters of the Ohio, when they are high, but which is dry until the river is ten feet above its lowest state, the inhabitants of which had always paid taxes to and voted in Indiana, which had been considered within its jurisdiction while it was a Territory, and after it became a State, while the jurisdiction of Kentucky had never been extended over them, — that such a body of land was not an island within the State of Kentucky.

2. That under the cession by Virginia to the United States of her territory, north-west of the River Ohio, the State of Indiana, formed out of that territory, extended to low-water mark.

In examining this case, it is very manifest that in determining the rights of the parties, it was only necessary to decide the first of these propositions, viz.: That what was claimed as an island was, in fact, part of the main land of Indiana, only occasionally and partially separated from it by a bayou, making part of the River Ohio, mingling with other streams, and returning to the river. The matter in controversy was determined by this decision. The question of the extent of the boundary of Indiana was not necessarily involved in it. Any opinion upon it was therefore *obiter*, not binding upon the court, and open to examination by counsel. But it will not be necessary to exercise this privilege. The rights of plaintiffs in error will be protected from the influence of this opinion, by showing the diversity between the cases.

This opinion is founded, —

1st. On the words of the cession, which transfer to the United States, "territory situate, lying, and being north-west of the River Ohio." The difference between the cases is striking. Georgia cedes to the United States all her territory lying west of a line to be drawn on and along the western bank of the Chattahoochee River. The territory ceded by Virginia is bound by the river; that yielded by Georgia, by a line drawn on the western bank of the river. The importance attached by the court, to this diversity in the terms of the two cessions is manifest. In pronouncing the opinion in Handley's Lessee v. Anthony, the Chief Justice says, not casually, or incidentally, but deliberately, and of set purpose, and as a precaution indispensable to the inquiry, (in substance,) that in pursuing this inquiry, the court must recollect, that it is the river, and not the bank, which con-

Howard et al. *v.* Ingersoll.

stitutes the boundary. Now why this precaution, if this diversity in the terms, the boundary by the *river* or by the *bank*, would make no difference as to the extent of the grant? The same distinction is recognized by Mr. Justice Story, in Thomas *v.* Hatch, ante; by Chief Justice Parker, in Hatch *v.* Dwight, before cited; and again by Mr. Justice Story, in Dunlap *v.* Stetson, 4 Mason, 349, 366.

There is then an essential difference between the boundary in this case, and that in Handley's Lessee *v.* Anthony, between a boundary by a river, and on a bank.

2. The next ground of the decision in that case, was the difficulty of drawing any other line, where a river is the boundary. Here the diversity which I have just remarked upon, is again recognized. The difficulty is supposed to exist where a river, not where a bank is the boundary. To apply the decision in that case, to the one at bar, is to assume the question in controversy here, and entirely to disregard the distinction so emphatically stated by the Chief Justice in that case.

But what is this difficulty? The rights of riparian proprietors on navigable rivers are limited to high-water mark. 3 Kent's Comm. 7th ed. 514. On non-navigable rivers to the thread of the stream.

Mr. Justice WAYNE delivered the opinion of the court.

The point for decision in these cases is one of boundary, between the States of Georgia and Alabama. It is, what is the line of Georgia on the western bank of the Chattahoochee River, from the 31st deg. north latitude, " where the same crosses the boundary-line between the United States and Spain; running thence up the said River Chattahoochee, and along the western bank thereof, to the great bend thereof, next above the place where a certain creek or river called ' Uchee,' (being the first considerable stream on the western side, above the Cussetas and Coweta towns,) empties into the said Chattahoochee River."

Its determination depends upon what were the limits of Georgia and her ownership of the whole country within them, when that State, in compliance with the obligation imposed upon it by the revolutionary war, conveyed to the United States her unsettled territory; and upon the terms used to define the boundaries of that cession.

In the case from Alabama, " the court charged the jury, that one passing from Georgia to Alabama, across the Chattahoochee River, at ordinary low water, would be upon the bank as soon as he left the water on the western side, although an inappreciable distance from the water, and that the line described in the treaty of cession from Georgia to the United States, as running

up said river and along the western bank thereof, is the line impressed upon the land by ordinary low water; and if they believed the plaintiff's mill was west of that line, and the defendant's dam backed the water so as to obstruct the operation of the mill, the plaintiff was entitled to recover."·

In the case from the Circuit Court of the United States for the District of Georgia, the District Judge. presiding, the jury was instructed "that by the true construction of these articles of cession, the boundary-line between the State of Georgia and Alabama was to be drawn on and along the western bank of the Chattahoochee River, at low-water mark, when the river was at its lowest state."

All of us think that both of these instructions were erroneous, though there is a difference among us as to the construction given by the majority of the court to the article defining the boundary of Georgia upon the river, and the reasoning in support of it. These differences will be seen in the opinions which our brothers have said they meant to give in these cases.

We will now give our views of what were the limits of the State of Georgia when it ceded its unsettled territory west of the Chattahoochee River to the United States; that State's then ownership of the whole of it, citing in support of our conclusions indisputable historical facts, and the legislation of Georgia, of . South Carolina, and of the United States, upon the subject.

It is well known to all of us, when the colonies dissolved their connection with the mother country by the Declaration of Independence, that it was understood by all of them, that each did so, with the limits which belonged to it as a colony. There was within the limits of several of them, a large extent of unsettled territory. Other States had little or none.

The latter contended, as all of them had united in a common declaration of independence, and in a common war to secure it, which no one colony could do for itself, that the unsettled lands within the former ought to become a common property among all of the States.

On the 6th of September, 1780, Congress recommended this subject to the consideration of the States. On the 10th of October after, it was resolved by Congress " that the unappropriated lands that may be ceded or relinquished to the United States by any State, should be disposed of for the common benefit of the United States; and be settled and formed into distinct republican States; which shall become members of the federal union and have the same rights of sovereignty, freedom, and independence, as the other· States." 3 Journals of Congress, 516, 535.

From these references we have the whole policy of Congress concerning those unsettled territories, so happily, since, consum-

mated by the States and by Congress. It was not, however, achieved without some delays and objections from the States to which these lands belonged. Some of the States, Maryland taking the lead, refused to sign the articles of confederation until after strong assurances had been given that such cessions would be made. And when that State did so, it was with the declaration that she did not relinquish or intend to relinquish the right which she had with the other States to the "back country," as she termed the unsettled lands within the limits of some of the States.

Early in 1781, Virginia made such a relinquishment. New York quickly followed, and Massachusetts and Connecticut, always willing to make any sacrifice for the common cause, relinquished their unsettled lands after the war had been concluded.

The cause assigned by each of these four States for doing so, and the principles upon which these cessions were accepted by the United States, involved North and South Carolina and Georgia in the obligation to do the same. Though not done for several years, it was never denied by either of these States.

All of the States had been actuated by the same spirit for independence. When the war had been happily concluded, all of them looked to the wild territory within the United States, as the first source from which revenue could be raised to pay the war debt of the Union. It then was $42,000,000.

It would be difficult to say which class of its creditors had the strongest claims upon the justice and gratitude of the people of the United States. But all felt, and it was conceded by the other classes of creditors, that the soldiers who had patiently borne the privations of the field, and bravely met its hazards to secure the liberties of the country, ought to have their claims paid by portions of the public lands, with certain available securities from Congress for the residue.

From these references we learn that the States entered into the Union, with the understanding by all of them, that each had an undiminished sovereignty within its colonial limits. That there were within the limits of some of them unsettled lands over which Congress had no legislative control. But that it was early recognized by these States whilst the articles of confederation were in the course of ratification and immediately after they were completed, that their unsettled territories were to be transferred by them to the United States, to be disposed of for the common benefit, and to be formed into distinct republican States, with all the rights and sovereignty of the other States.

We have seen that relinquishments had been made by Virginia, New York, Massachusetts, and Connecticut. South Carolina did the same in 1787, after the settlement of her territorial disputes with Georgia.

We will now state what those disputes were, and how they were adjusted, in order that the jurisdiction of the State of Georgia and that State's ownership of the whole territory ceded by it to the United States in 1802, may be fully understood, in connection with the principles or rules by which its western boundary upon the Chattahoochee River must be interpreted.

Georgia was originally a province, formed by royal prerogative, out of a portion of that territory which was within the chartered limits of South Carolina. It was a corporation under the title of " Trustees for establishing the Colony of Georgia in America, which was to continue for twenty-one years, with power in the trustees to form laws and regulations for its government, after which all the rights of soil and jurisdiction were to vest in the crown."

It was described in the act of incorporation, " as all those lands, countries, and territories, situate, lying, and being in that part of South Carolina in America, which lies from the northern stream of a river, then commonly called the Savannah, all along the sea-coast to the southward under the most southern stream of a certain other great water or river, called the Alatamaha, and westward from the heads of the said rivers respectively in direct lines to the South Seas."

It may be well here to say, that the power of the king to alter, change, enlarge, or diminish the limits of his royal governments in America, cannot be denied. " Those governments were of two kinds, royal and proprietary. In the former, the right of the soil and jurisdiction remained in the crown, and their boundaries, though described in letters-patent, were subject to alteration at its pleasure; for as it possessed the right of soil and government, and delegated them to its governors during pleasure, it might dispose of them in what manner and to whom it thought fit, might alter, extend, or abridge them as its inclination or policy might declare. In proprietary governments the right of soil as well as jurisdiction was vested in the proprietors. These charters were in the nature of grants, and their limits being fixed by these charters, could not be altered but by their consent."

South Carolina, then, could not object either to the first charter given to Georgia, or to the subsequent extension of its boundaries by the king, though forming a part of what had been within the charter of that royal colony.

In 1763, Great Britain having then acquired, by treaty with Spain, — Florida, Pensacola, and all that Spain had held in North America, east and south-east of the River Mississippi; all of that country between the Alatamaha and Florida, originally within the chartered limits of South Carolina, but which had

always been disputable territory between England and Spain, the then governor of South Carolina assumed to be at his disposal under his royal commission. Within the year 1763 he granted to many persons in Carolina large tracts of land, lying between the Alatamaha and St. Mary's Rivers His power to do so was objected to by Georgia, but her remonstrances were not regarded. The subject was brought to the notice of the Board of Trade. The governor's conduct was disapproved, declared to be unwarrantable, and orders were given that no charters or grants should be issued for lands on the south of the Alatamaha River, which had been surveyed under warrants from South Carolina. But as surveys had been made under the governor's warrants, and grants issued by South Carolina for the lands, before the orders of the Board of Trade were received, they were not formally recalled. These transactions, however, excited much attention at the time in England, from the representations which were made concerning them by Governor Wright, of Georgia. The ultimate consequence was, that the king, in January, 1764, extended the limits of Georgia, including within them all that country which had been within the chartered limits of South Carolina, and limiting the south boundary of that colony by the northern stream of Savannah River, as far as the head of the same. The language of the letters-patent, granted to Sir James Wright, is, that the colony of Georgia shall be bounded on the north by the most northern stream of a river, then commonly called Savannah, as far as the head of the said river ; and from thence westward as far as our territories extend; on the east by the sea-coast, from the said river Savannah, to the most southern stream of a certain other river, called St. Mary's, including all islands within twenty leagues of the coast lying between the said Rivers Savannah and St. Mary's, as far as the head thereof; and from thence westward as far as our territories extend by the north boundary-line of our provinces of East and West Florida," which was "a line drawn from that part of the Mississippi which is intersected by latitude 31, due east, to the Appalachicola." See the King's Proclamation and letters-patent to Sir James Wright, Wat. 744.

For twenty years after this extension of Georgia, its limits were not called in question by South Carolina, or perhaps, to speak more properly, they had not been a subject of inquiry by that State, though what they were, was well understood by the authorities of Georgia. Nothing had occurred between 1764 and 1776, from which any contest concerning them could arise, and it was not until two years after the provisional treaty of peace between England and the United States was made, that South Carolina claimed any part of the unsettled territory of

34 *

Georgia, within the limits defined by the king's patent of January, 1764.

The provisional treaty of peace with the King of Great Britain was signed in November, 1782. In the 2d article will be found the boundaries of the United States. They are repeated in the definitive treaty concluded at Paris on the 3d September, 1783. In less than four months after the provisional treaty was made, Georgia declared, legislatively, that the southern boundary of the State was a line drawn from the Mississippi in the latitude of 31 degrees, on a due east course to the River Chattahoochee, and in other respects according to the southern boundary of the United States, as that was settled by the provisional treaty between the United States and Great Britain. The southern boundary of the United States is described, in the treaties with England, " as a line to be drawn, due east, from the middle of the Mississippi River, in the latitude of 31 degrees north of the equator, to the middle of the River Appalachicola or Chattahoochee, thence along the middle thereof, to its junction with the Flint, thence straight to the head of the St. Mary's River, and thence down along that river to the Atlantic ocean." Compare this boundary with that in the commission to Governor Wright, for the Colony of Georgia, and they will be found identical. Indeed, unless the chartered limits of Georgia, as they are stated in that commission, had been taken by the negotiators of the treaty with England as their guide, they would not have had any by which to run the southern line for the United States from the Mississippi to the Chattahoochee, and thence as it is described to the Atlantic Ocean.

The next action of Georgia, asserting its jurisdiction over its limits, will be found in the 13th sect. of the act of February, 1783, Wat. Dig. 264. It defines what those limits were. In February, 1785, Georgia passed another act for the establishment of a county to the west of the Chattahoochee, within a line to be drawn down the Mississippi from where it receives the Yazoo, till it intersects the 31st degree of north latitude, thence due east as far as the lands might be found to reach, which had at any time been relinquished by the Indians, then along the line of relinquishment to the River Yazoo and down to its mouth, calling it the county of Bourbon.

This last act, and the two which preceded it, attracted the notice of the authorities of South Carolina, and then that State, for the first time since 1764, denied that the limits of Georgia were as she had declared them to be, and claimed for itself within them a large extent of country.

South Carolina reasserted her claim upon the principle that her surveys had been made in 1763, between the Rivers Alatamaha.

and St. Mary's, forgetting that her then governor had been reproved and had apologized for authorizing them to be made, and denied that the source of the Keowee River was the head of the Savannah River, and that the country between its source and the source of the Tugaloo River down to the mouth of the Keowee, where it empties into the Savannah, belonged to Georgia.

Neither State would yield, and the border excitements, growing out of the differences, admonished both that it would be best and safest for them to resort to that court which had been provided in the 9th article in the confederation for "the settlement of disputes then existing or that might arise between two or more States concerning boundary, jurisdiction, or any other cause whatever."

South Carolina presented a petition for that purpose. Georgia was cited to appear, and did so. Congress then provided for the appointment of judges, and at this point of the proceedings, Carolina withdrew her petition, it having become the conviction of both States, from information brought out by the controversy, that these differences could be amicably adjusted.

Carolina had contended that as the original boundaries of Georgia were the Rivers Savannah and Alatamaha, and lines drawn due west from their sources to the Mississippi; that all the land lying south of the Alatamaha, and a line drawn due west from its source to the Mississippi, as far as the northern boundary of the Floridas, continued to be a part of the province of South Carolina, out of which Georgia was taken. And that when the British crown, by its proclamation of October, 1763, annexed to Georgia, all the lands lying between the Rivers Alatamaha and St. Mary's, it meant only the lands between those rivers below their sources, and not such as lay above those sources, and between lines drawn from them respectively west to the Mississippi; which tract of country, of course, even after the proclamation, still continued a part of South Carolina.

Georgia, on the contrary, maintained, that when the proclamation annexed to its government all the lands lying between the Rivers Alatamaha and St. Mary's, it meant not merely the tract of country which lay between those rivers, below their sources, but also the whole territory held by the British crown, between the northern boundaries of Florida, as established by the same proclamation, and the ancient line of Georgia.

Carolina further claimed the land lying between the North Carolina line and the line due west from the mouth of the Tugaloo River to the Mississippi, because the River Savannah loses that name at the confluence of the Tugaloo and Keowee Rivers, and consequently that spot was said to be the head of Savannah River. Georgia contended that the source of the Keowee was the head of the Savannah River.

At this time, neither State had such original documents from the archives of England as were sufficient to determine its right with certainty. But Georgia had secondary proof of the letters-patent which were given by the king to Governor Wright, in 1764, though they had been taken away with him when he fled from the State during the revolutionary war. The original commission and letters-patent were subsequently obtained from the records of the Board of Trade in England. They fully confirmed the correctness of the secondary proof upon which the State had acted. There was also at the same time disclosed from those records, in detail, all of the action of the Board of Trade and of the king, concerning Governor Boone's surveys in 1763, of the land between the Alatamaha and St. Marys, with the disapprobation of all that he had done in that matter and the governor's apology for his conduct. Though done already, we will introduce into this connection the boundaries of Georgia in the letters-patent to Governor Wright, that the controversy between Georgia and South Carolina, and its amicable termination, may be better understood.

After South Carolina withdrew her petition from Congress, the said States entered into a convention for the settlement of the territorial differences between them. It was concluded at Beaufort, in April, 1787. Carolina was represented by three of her most distinguished citizens of that day, and Georgia by three of hers, in whom the State had every confidence. It was ratified by both States, though one of the three commissioners from Georgia, Mr. Houston, was dissatisfied with, and would not sign it.

By this convention, it was agreed, "that the most northern branch or stream of the River Savannah, from the sea or mouth of such stream to the fork or confluence of the river now called Tugaloo and Keowee, and from thence the most northern branch or stream of the said River Tugaloo, till it intersects the northern boundary line of South Carolina, if the said branch or stream of Tugaloo extends so far north, reserving all the islands in the said River Tugaloo and Savannah to Georgia; but if the head spring or source of any branch or stream of the said River Tugaloo does not extend to the north boundary line of South Carolina, then a west line to the Mississippi to be drawn from the head-spring or source of the said branch or stream of Tugaloo River, which extends to the highest northern latitude, shall forever hereafter form the separation limit and boundary between the States of South Carolina and Georgia. 1 Art. Convention, Wat. Dig. 754.

From this article, we see that South Carolina abandoned the ground taken in her petition, and only claimed territory in Geor-

gia, in the event that a geographical fact should turn out differently from what the commissioners of Georgia said it was, and accordingly with what the commissioners of South Carolina supposed it to be. That was, whether or not the head spring or source of any branch or stream of Tugaloo extended to the north boundary line of South Carolina. If it did not, then from wherever the head spring or source of that river might be lower than this north boundary line, Carolina could claim from it by a line drawn west to the Mississippi, all the land which was between that line and the higher north line which Georgia had before declared to be the boundary of this State. But if the head spring or source of the Tugaloo did reach the north boundary-line of South Carolina, then that stream to its source was to be the boundary between the two States, to the west of which Carolina could not then claim any land. Georgia, on its part, by the same article, withdrew its claim to that part of South Carolina which is between the Keowee and Tugaloo Rivers, where the most northern branch of the Tugaloo intersects the northern boundary-line of South Carolina.

South Carolina, however, acting upon the opinion of its commissioners, that the head spring of the most northern branch of the Tugaloo did not intersect the northern boundary-line of that State, ceded to the United States, in three months after the convention with Georgia had been made, all the territory which it was supposed Carolina had got by it in Georgia.

The cession is as follows: "All the territory or tract of country included within the River Mississippi, and a line beginning at that part of said river which is intersected by the southern boundary-line of the State of North Carolina, and continuing along the said boundary-line until it intersects the ridge or chain of mountains which divides the eastern from the western waters, then to be continued along the top of the said ridge of mountains until it intersects a line to be drawn due west from the head of the southern branch of Tugaloo River to the said mountains, and thence to run a due west course to the River Mississippi.

The United States accepted the cession, and until by actual exploration it had been ascertained that the head spring or branch of the Tugaloo River was north of the line of South Carolina, it was not known that the land actually transferred to the United States by the South Carolina cession was only a tract of country about twelve miles wide from north to south, extending from the top of the main ridge of mountains which divides the eastern from the western waters, lying between latitude 35° N., the southern boundary of North Carolina, and the northern boundary of Georgia, as settled by the convention be-

tween Georgia and South Carolina in 1787; and that by that convention it was established that South Carolina had no unsettled territory to the west of the top of that ridge.

It was, however, a transfer of all the claim of South Carolina to unsettled land. North Carolina afterwards ceded to the United States its western lands. Georgia was the only remaining State which had not done so.

The termination of her differences with South Carolina placed Georgia, as to its limits, accordingly with that State's declaration of them in 1783, or as they had been given by the king in his commission to Governor Wright in 1764, and as they had been used by the United States for the treaties of peace with England, and afterwards in its negotiations with his Catholic majesty from 1793 to 1795, which resulted in the treaty of that year with the latter.

It may as well be mentioned here, however, that in the course of that negotiation, Spain contended that the boundary of West Florida was at the junction of the Yazoo with the Mississippi, in latitude 32° 39′, running from that point east to the Chattahoochee River. The claim was founded upon certain proceedings of the king of Great Britain between the years 1763 and 1767, extending the northern boundary of West Florida from 31° north to the mouth of the Yazoo, within two months after the commission had been given to Governor Wright, in which 31° north, or the north boundary-line of our provinces of East and West Florida "were declared to be the southern boundary of Georgia. These proceedings were an application to the king in 1764 by the Board of Trade for an extension of the boundaries of West Florida, and commissions given by the king in 1767 and 1770 to Governors Elliot and Chester, by which they were made Captains-General and Governors of West Florida, bounded to the southward by the Gulf of Mexico, including all its lands within six leagues of the coast, from the River Appalachicola to Lake Pontchartrain; to the westward by the said lake, the Lake Maurepas, and the River Mississippi; to the northward by a line drawn due east from the mouth of the Yazoo River, where it unites with the Mississippi, due east to the Appalachicola." This pretension upon the part of Spain was considered as altogether inadmissible by our negotiators, on the ground that the United States commissioners and those of the king of England, in making the treaties of 1782 and 1783, had taken the boundaries of East and West Florida as laid down in the proclamation of the king of England dated the 7th October, 1763, as the true boundaries of those provinces when they were finally confirmed to Spain in 1783. And further, that Spain could not rightfully dispute it or

attempt to extend her boundary to the north of 31 degrees, because she had been substantially a party to all the negotiations which resulted in a peace between herself and England and between England and the United States, with a full knowledge by the Spanish negotiators that the boundaries between England and the United States had been fixed in the line of 31 deg. from the Mississippi to the Appalachicola or Chattahoochee. Spain conceded it.

After the treaty had been made, however, it was suggested, as the treaties with England had been made with the United States, and not with the State of Georgia, that the former might claim the territory between 31 deg. north and the line from the Yazoo to the Chattahoochee, upon the ground that the king had extended Florida to the latter, or limited Georgia to that line after he had declared the southern line of Georgia was to be the northern line of Florida. But the United States did not at any time assert such a claim. It could not well have been done upon principle after the United States had rejected those papers as giving any ground of claim to Spain and had insisted on the negotiation upon the southern boundary of the United States as defined in the treaty of peace with England upon the ground that it had been from 1763 the boundary of Georgia. It may not be amiss, however, to notice as a historial fact, the objections which were made against the availableness of these documents for the extension of the boundary of Florida to the Yazoo when they were first produced. No patent could be found from the king under the great seal of Great Britain for such a purpose. There was no record of such a grant in the Board of Trade, nor in any other of the archives of England concerning her possessions in America. It could not be found in the archives of Florida. Without such a patent, or a proclamation in the nature of a patent for such a purpose, no colonial claim for territory was complete.

Such was and has been the uniform basis of colonial limits; and it is somewhat remarkable that in no instance besides of English colonial grant, is the king's patent wanting. In this instance the extension is vested exclusively upon two commissions to two Governors of West Florida, one three years after the petition from the Board of Trade, to Governor Eliott in 1767, and the other to Governor Chester in 1770. In the first there is a recital of the boundaries of West Florida, when Governor Johnstone received his commission in 1763, followed by this declaration, that the king had recited, by letters-patent under the great seal of Great Britain, his grant of boundaries for Florida as to its northern line of 31 deg. from the Mississippi to the Chattahoochee and extended them to the Yazoo, by a line drawn from

it on the Mississippi to the Appalachicola. The same boundary was given in the commission to Governor Chester. There is no doubt that Governors Eliott and Chester permitted settlements and gave grants for land within the limits of these commissions from their dates until Florida became, in 1783, by a retrocession from England, again a part of the dominions of his Catholic majesty. From these circumstances, a patent from the king for the enlargement of Florida was presumed. It was not unreasonable that it should be. But it was not considered by the United States that its operation could set aside the previous grant to the colony of Georgia of the same territory, as the king, in his treaties with the United States, had recognized the line of the latter as the boundary of Florida, and that it had been accepted in that character by the United States as its southern boundary. In fact, admitting that the king's patent had been given, his treaty with the United States was a revocation of it, and Spain could not claim from its treaty with England any right to the extension, that having been a political act of the king of England for the benefit of his own subjects, when, by his proclamation of 1763, Florida, as it had been acquired from Spain, was for the first time erected into the two distinct governments of East and West Florida.

It appears, from what has been said, that the limits of Georgia, after the settlement of her territorial dispute with South Carolina, were not questioned; in other words, that they had been rightly asserted in the act of 1783, and that such portion of the State, afterwards designated as the Mississippi Territory, was within its acknowledged boundary. Georgia became then for the first time in a condition to transfer to the United States its unsettled territory. In less than a year after the last appeal from Congress to the State to do so, her delegates in Congress were authorized to make a cession of a part of it. The beginning of it was at the middle of the Chattahoochee, where it is intersected by the thirty-first degree of north latitude; thence due north one hundred and forty British statute miles; thence, due west to the middle of the River Mississippi; thence down the middle of the river where it intersects the thirty-first degree of north latitude; thence along the said degree to the beginning. The quantity offered, and the conditions upon which it was to be ceded, were objected to by the United States. It was particularly uacceptable to Congress, because such a cession left a larger portion of unsettled territory within the State undisposed of, and interfered with the original obligation and intention of Congress to establish in the unsettled territories which might be relinquished by the States to the United States, other States, to become a part of the Union upon an entire equality with the rest.

Congress refused to accept the cession tendered, at the same time offering to accept from Georgia all her territorial claims west of the River Appalachicola, or west of a meridian line running through or near the point where that river intersects the thirty-first degree of north latitude. Georgia, in turn, refused the proposal of the United States, and thenceforward maintained her jurisdiction within her limits, until a cession was made of her unsettled territory to the United States in 1802. In 1789 an act was passed by the State reserving to certain persons and companies preëmption rights to her lands. In 1795, by another act, in which the territorial jurisdiction of the State was reasserted, Georgia granted and transferred, for valuable considerations, to several companies, all of her territory bordering westwardly on the Mississippi River, in distinct tracts. Among others, a tract comprehending a part of what was subsequently declared by Congress to be the Mississippi Territory. The prices for some of these alienations were paid into the treasury of the State, and patents for them were issued by the governor. At the next session, however, of the General Assembly the act of 1795 was declared to be void on account of the fraud, bribery, and corruption by which it had been passed. But the companies to which Georgia had conveyed had sold part of the land to innocent purchasers before the revoking act was passed. They appealed to Congress to maintain them in their rights, as well against any future claim of Georgia, as against any claim that the United States might make to the land which had been conveyed by Georgia. Unfavorable at first as these sales by Georgia were to a transfer of its unsettled territory to the United States for the common benefit of all the States, they contributed to that result afterward. The action of the State had involved it in difficulties of a very uncertain termination in a legal point of view. It had just been released from an unpleasant litigation, (American State Papers, Public Lands, Vol. I. p. 167. Moultrie et al *v.* The State of Georgia, not reported,) growing out of an act passed by the State in 1789, conveying lands between the Mississippi and Tombigbee Rivers to the Virginia, South Carolina, and Tennessee Yazoo Companies, by the 11th amendment of the Constitution, by which the States were declared not to be suable in the courts of the United States by citizens of another State or by citizens or subjects of a foreign State. This, however, did not conclude the rights of the parties in favor of the State to the lands which the State had contracted to convey to them. The right of the State, too, to large bodies of land within the Yazoo and its southern boundary, was doubtful on account of grants from Spain before it had ceded Florida to England; from England, also, on account of such as

had been made under the authority of the Governors of West Florida; and by Spain again after the retrocession of the territory to it by England in 1783. But the greatest difficulty in the way of the State continuing to hold its unsettled territory was that the Indian title had only been extinguished to about three millions of acres out of fifty millions. At one time the Indians were not inclined to sell; the State was not in a pecuniary condition to buy them out. The Indians were formidable in tribes and numbers. Their habitations and their hunting-grounds covered the larger part of the State. Its white population was then small and too scattered for warlike concentration against Indian hostilities or their casual incursions into the white settlements for plunder. They were masters of the forest, and intervened all over the State between the white settlements, so that no one of them could have intercourse or give aid to another without a license to pass through their hunting-grounds or at the risk of attempting it without permission. On the other hand, white men in numbers, no longer under the influences of social life, or caring nothing for its restraints, hovered constantly on the borders of the Indians, exasperating them by depredations and misleading them into all the excesses of a corrupt civilization, or into feuds with each other or forays against the whites. Each day was an anticipation of attack, and when the night came repose was only taken with the rifle ready to repel it. In this condition of things, and without any efficient power in the State to make a change, it became necessary for the United States to use its constitutional right to give relief. That was not so much a matter of choice as it was of obligation. Constitutionally they could alone regulate commerce with the Indian tribes. Constitutionally they had the power to make war; their obligation was to bear its expenses and defend the States against it in whatever way it might happen; and constitutionally Congress was bound to guard against war, to prepare for and prevent, it from whatever quarter it might be likely to come. The recent treaty, too, with Spain, bound that nation and the United States to restrain the Indian tribes, in the territories of each, from war among themselves and from such as might lead to aggressions upon the territories of either nation. Added to such considerations, the people who had settled to the west of the Chattahoochee, between it and the Yazoo River, claimed from the United States the protection which Georgia could not give, and they asked for a securer and more definite political organization than they had had either under English or Spanish rule, or from Georgia legislation.

Nine years had gone by since the failure of the last attempt to obtain it, without any thing having been substantially done

by Georgia to transfer to the United States its unsettled territory, in compliance with the resolution of Congress of 1780. All the other States had done so. It was not likely, at the time, that it would be done for some years yet. Under such circumstances, Congress, still thinking that the United States had, under the cession of South Carolina, a right to territory in Georgia, passed the act of the 7th April, 1798, for the amicable settlement of limits with the State of Georgia, and authorizing the establishment of a government in the Mississippi Territory. It was done with an express recognition of Georgia's right of soil and jurisdiction in the territory. Sec. 6 of the act. This, however, did not satisfy that State, and she remonstrated to Congress against it. But the political necessity under which Congress had been called upon to act, soon became obvious to all, and to none more than to the people and the legislature of Georgia. It is not necessary to give an account of all that passed from that time to the transfer of the territory to the United States. Three of Georgia's most distinguished citizens were appointed commissioners to negotiate with three others of national reputation upon the part of the United States for a cession, and happily that was done in 1802, which had been so long delayed;— thus consummating that great policy of our early national existence, from which so many States have been added to the Union.

From the account which has been given of the territorial claims of Georgia, and her legislation concerning them, with that of South Carolina denying them, and the final adjustment of the dispute between these States and that of the United States for the cession by Georgia of her unsettled territory, we have learned that when Georgia did cede it to the United States, that she was then in possession, and had a right to all the land, subject to the Indian title, which that State had declared to be within her limits, except so much as there was between the Tugaloo and Keowee Rivers, which Georgia had ceded to South Carolina by the convention of 1787. We further learn, that the adjustment with South Carolina, left in Georgia the Chattahoochee River from its source to the 31st degree of north latitude, as Georgia had claimed her limits to be, since the king's patent to Sir James Wright, in 1764.

In other words, that the Chattahoochee, from its source to that point, was at all times after that patent within Georgia with the right of soil and jurisdiction when its unsettled territory was ceded to the United States. This fact being so, it gives us a key from the laws of nations to aid us in the interpretation of its cession as to the boundary between Georgia and Alabama, which must prevail, as it would in all other cases,

where there may be a transfer by one nation of a part of its territory to another, with a river for its boundary, without an express stipulation for the relinquishment of the rights of soil and jurisdiction over the bed of such river.

The rule *jure gentium*, to which we refer, is not now for the first time under the consideration of this court. We are relieved, then, from its discussion, by citations from Vattel and other writers upon the laws of nations, to show what it is; but it will be found in the 22d chapter of Vattel. Among the writers after him it is not controverted by any one of them. Besides, it is according to what had been anciently the practice of nations, substantiated by an adherence to it down to our own times. In Handley's Lessee v. Anthony, 5 Wheat. 379, this court said, by its organ, Chief Justice Marshall, "when a great river is the boundary between two nations or States, if the original property is in neither, and there be no convention about it, each holds to the middle of the stream. But when, as in this case, one State is the original proprietor, and grants territory on the one side only, it retains the river within its domain, and the newly-created State extends to the river only." The river, however, is its boundary.

Georgia was certainly the original proprietor of the River Chattahoochee to 21 degrees north, when her territory west of it was ceded to the United States, and that cession must be understood to have been made under the rule, unless by terms in her grant to the United States it was taken out of it, with the view to give to the new State which was to be formed out of the cession, a coequality of soil and jurisdiction in the river which was to separate them. In the interpretation of the boundary which Georgia retained for itself upon the Chattahoochee, it must be kept in mind that the cession was made in contemplation of a new State to be formed with the Chattahoochee as a part of its boundary. National considerations then entered into the spirit of the transfer with which its eminent negotiators on both sides were familiar.* If we disregard them now, and permit ourselves to view this question in the narrower limits of verbal definitions, and upon the principles upon which private rights were adjusted on rivers, between proprietors of land on either side of them, we should do so forgetting all the circumstances and objects for which the cession was made, the parties to it, and the new party that was to be brought out of it as an independent State.

But we will now examine the article in the cession for the

* The commissioners on the part of the United States were Mr. Madison, Mr. Gallatin, and Mr. Lincoln. Those on the part of Georgia were James Jackson, Abraham Baldwin, and John Milledge.

Howard et al. v. Ingersoll.

boundary of Georgia upon the Chattahoochee, for we think its terms are coincident with the principle of national law, under which we have put this question.

We give the article entire, intending, after it has been done, to use it with direct reference to the cases in hand as to the question of boundary on the Chattahoochee River, between the States of Georgia and Alabama, as that question was raised in the courts below.

" The State of Georgia cedes to the United States all the right, title, and claim, which the said State has to the jurisdiction and soil of all the lands situated within the boundaries of the United States, south of the State of Tennessee, and west of a line beginning on the western bank of the Chattahoochee River, where the same crosses the boundary-line between the United States and Spain, running thence, up the said River Chattahoochee and along the western bank thereof, to the great bend thereof, next above the place where a certain creek or river called Uchee, (being the first considerable stream on the western side above the Cussetas and Coweta towns,) empties into the said Chattahoochee River; thence in a direct line to Nicajack, on the Tennessee River; thence crossing the said last-mentioned river, and thence running up the said Tennessee River, and along the western bank thereof to the southern boundary-line of the State of Tennessee."

The plaintiff in error derives his title to the land which he claims from the State of Georgia, and his right to construct a dam across the Chattahoochee to the point where it terminates on the western bank under that title and the convention by which Georgia ceded her unsettled territory to the United States. He claims that his land runs across, from the eastern bank of the Chattahoochee to the bank on the western side. The defendant in error claims under a patent from the United States to himself to fractional section 11, township 7, range 30, and proved title to himself to lots 1, 2, 3, 4, in the town of Gerard, in Russel county, Alabama, specifically described, in some of said counts of his declaration, as land having for its eastern boundary the State of Georgia, and is immediately west of the Chattahoochee River, on the bank thereof.

In the first case, No. 121, it was ruled by the court below, that the line established by the articles of cession was the line impressed by ordinary low water. In the case from the Circuit Court of the United States for the District of Georgia, the judge instructed the jury that the line was to be drawn on and along the western bank of the Chattahoochee River at low-water mark, when the river was at its lowest state.

From the bill of exceptions, in the first case, it appears that

35 *

" immediately at the plaintiff's lands and lots, the banks of the river are from fifteen to twenty feet high on both sides, abrupt above and below for considerable distances. The high banks, however, do not extend down to the water's edge at ordinary low water. The bed of the river at this point is about two hundred yards wide from bank to bank; by the bed is meant the space between these abrupt and high banks; and is composed of rocks and slues among the rocks from one side to the other. Ordinary low water and extreme low water together prevail for about two thirds of the year, during which time the river is confined to a channel about thirty yards wide, leaving the bed of the river as above described, exposed on each side of this channel from thirty to sixty yards. Immediately under the western abrupt and high bank, and within the latitude of the north and south boundary-line of plaintiff's land, those lines being drawn down to the water's edge, and in the bed of the river; as above described, east of the western abrupt and high bank, the plaintiff erected a mill previous to 1842, and continued in the possession and use of it until overflowed by defendant's dam. The place on which the mill is, is covered with water in ordinary high water, but is bare and dry in ordinary low water."

" To supply his mill with water, the plaintiff had erected a cross-dam, which ran in a north-east direction into the river, and supplied his mill with water at all seasons, by diverting a portion of the stream to the mill, which passed again into the river above the defendant's dam; and the plaintiff had blown out a rock to give room to his mill to work."

The evidence in the case, from the Circuit Court of Georgia, in respect to the situation of the plaintiff's mill and the description of the river, is substantially the same.

It appears from it, that the mill of the plaintiff, by his own showing, is in the bed of the river, to the east of the abrupt bank, by the prolongation of his north and south boundary-line from the bank, which he claims a right to prolong, from his being the owner of the land to the bank of the river, as a riparian right.

Upon this evidence, the court in Alabama charged the jury, that one passing from Georgia to Alabama, across the Chattahoochee River at ordinary low water, would be upon the bank as soon as he left the water on the western side, although an inappreciable distance from the water, and that the line described in the treaty of cession from Georgia to the United States, as running up said river, and along the western bank thereof, is the line impressed upon the land by ordinary low water; and, if they believed plaintiff's mill was west of that

line, and defendant's dam backed the water so as to obstruct the operation of the mill, the plaintiff was entitled to recover. The defendant in this case excepted to the charge, and asked the court to instruct the jury, if the bank of the river was ordinary low-water mark, that the plaintiff had no right to the use of the water at that stage, which the court refused to give. In the case from the United States Circuit Court, the defendants below — plaintiffs in error here — prayed the court to instruct the jury, that the true interpretation of the article of cession requires the boundary-line between Georgia and Alabama to be drawn on and along the western bank of the Chattahoochee River; and that, wherever the jury might find that bank to be, the jurisdiction and limits of Alabama must terminate, and cannot pass to the eastward of the same; but that all east of such line, whether it be land or water, is included within the limits and jurisdiction of Georgia; and no grant, from the United States or the State of Alabama, can confer title to any part of the same, either directly or indirectly, by virtue of such grant, or as an incident to the same. This prayer was refused; and the court instructed the jury, that the boundary-line between the States of Georgia and Alabama was to be drawn on and along the western bank of the river, at low-water mark, when the river was at its lowest stage.

In our view, the words of the cession have the same meaning in law that they have in common parlance. They are not at all uncertain, if taken connectively, as to the locality intended for the western line of Georgia on the Chattahoochee. Separate the word bank from " on and along the bank," and consider it only in connnection with the other words, "running up the river," and it might be inferred that the water of the river, at some stage of it, was to be the boundary, and that those owning the land on either side were riparian proprietors, *usque ad filum aquæ.* But not so when they are considered together, as we will presently show.

When the commissioners used the words bank and river, they did so in the popular sense of both. When banks of rivers were spoken of, those boundaries were meant which contain their waters at their highest flow, and in that condition they make what is called the bed of the river. They knew that rivers have banks, shores, water, and a bed, and that the outer line on the bed of a river, on either side of it, may be distinguished upon every stage of its water, high or low; at its highest or lowest current. It neither takes in overflowed land beyond the bank, nor includes swamps or low grounds liable to be overflowed, but reclaimable for meadows or agriculture, or which, being too low for reclamation, though not always covered

with water, may be used for cattle to range upon, as natural or uninclosed pasture. But it may include spots lower than the bluff or bank, whether there is or is not a growth upon them, not forming a part of that land which, whether low or high, we know to be upland or fast lowland, if such spots are within the bed of the river. Such a line may be found upon every river, from its source to its mouth. It requires no scientific exploration to find or mark it out. The eye traces it in going either up or down a river, in any stage of water. With such an understanding of what a river is, as a whole, from its parts, there is no difficulty in fixing the boundary-line in question. Wherever that outer bed-line shall be, from its beginning on the bank, at the 31st degree of north latitude, to the mouth of the Uchee, on the western side, is the western boundary of Georgia on the bank and along the bank running up the River Chattahoochee.

If the language of the article had been, " beginning on the western bank of the Chattahoochee, and running thence up the river," and no more had been said, the middle thread of the river ordinarily, and without any reference to the fact that Georgia was the proprietor of the river, it would have been said to be the dividing line between the two States. But there is added, " running up the said River Chattahoochee and along the western bank thereof." This last controls any uncertainty there may be; for if the first call or object to locate the line is the bank of the river, it is plain that the western limit of Georgia on and along the bank of the river, must be where the bank and the water meet in its bed within the natural channel or passage of the river. The words " along the bank," added to the words, " on the bank," distinguish this case from all of those in which courts have had the greatest difficulty where a line was to be fixed when it is on the bank without a call for the stream or along the river, or up or down the river. Angell, 19. Along the bank, is strong and definite enough to exclude the idea that any part of the river or its bed was not to be within the State of Georgia. It controls any legal implication of a contrary character. Such a line, too, satisfies the calls on and along the bank in the navigable and unnavigable parts of the river. In the former, Alabama has all the uses of the river, including the use of the western bank for navigation and commerce, which the State of Georgia can claim. In that part of the river not navigable, Georgia has both soil and jurisdiction for all such purposes as are implied by both, and the stream or water of the river for all such purposes as it may be used in any stage of the water.

Such a line may be made certain on every part of the river, whatever may be the changes on the western bank from wash-

Howard et al. *v.* Ingersoll.

ings, the abrasions of extraordinary floods, or from any of those sudden causes which in nature change the beds of rivers. In such cases the proprietors would continue to hold according to the original boundaries of their grants. We repeat, " along the bank thereof," is the controlling call in the interpretation of the cession. It excludes the idea that a line was to be traced at the edge of the water as that may be at one or another time or at low water, or the lowest low water. Water is not a call in the description of the boundary, though the river is, and that, as we have shown, does not mean water alone, but banks, shores, water, and the bed of the river. If water, as one of the river's parts, had been meant, it would have been so expressed.

The call is for the bank, the fast land which confines the water of the river in its channel or bed in its whole width, that is to be the line. The bank or the slope from the bluff or perpendicular of the bank may not be reached by the water for two thirds of the year, still the water line impressed upon the bank above the slope is the line required by the commissioners, and the shore of the river, though left dry for any time, and but occasionally covered by water in any stage of it to the bank, was retained by Georgia as the river up to that line. Wherever it may be found, it is a part of the State of Georgia, and not a part of Alabama. Both bank and bed are to be ascertained by inspection, and the line is where the action of the water has permanently marked itself upon the soil. Wherever that line may be, is to be determined in each trial at law by the jury upon proofs, the jury being instructed by the court that the bed of the river, wherever that may be, belongs to Georgia, whether it extends at certain points to the face of the bank where, from the perennial flow of the water there is no margin, or to other points where there is.

We must reject, altogether, the attempt to trace the line by either ordinary low water or low water. These terms are only predicable of those parts of rivers within the ebb and flow of the tides, to distinguish the water line at spring or neap tides. Such a difference is uniform twice within every month of the year, and because it is so it is termed ordinary. In that part of a river in which there is no ebb and flow, the changes in the current are irregular and occasional, without fixed quantity or time of recurrence, except as they are periodical with the wet and dry seasons of the year. And low water is the furthest receding point of ebb tide. Nor do we think that the interpretation of this article is aided by any cases upon the rights of riparian proprietors. Such rights depend upon calls in grants for land either from sovereignties having an equal right in the stream to the thread of the river, or from grants from a State having the en-

tire ownership of a river.  In this instance, two sovereignties
were dealing for a cession of country from one to the other, with
a river as a boundary between them to be marked on that bank
of it from which the ceded land was to commence.  Now, as
between them, there were no antecedent calls upon the river
to raise the question of riparian rights.  But, on the contrary,
the river at the time formed a part of what was Georgia, and
the commissioners negotiated upon the footing, that though the
United States had formed the Mississippi Territory, it was done
with the disclaimer in terms, that it in no way whatever should
affect either the rights of sovereignty or soil which Georgia had
in the territory.  Moreover, we do not think that the commis-
sioners could have contemplated that the State of Georgia and
the United States were to have a divided or equal sovereignty
in the river, or that the United States was to retain any right
of soil in the same, when we find the commissioners in terms
calling for the boundary-line between Spain and the United
States in the middle of the Chattahoochee, and then transferring
the western line of Georgia to the western bank of it.

If the running water of the river had been intended to be the
line, and that the United States and Georgia were to have an
equal right of soil and sovereignty in the bed of the river, on the
western bank, why was it that the middle of the river at latitude
31 degrees north, was abandoned for the western bank?  The only
answer which can be given is, that Georgia meant to retain the
river to the western bank, and that the United States conceded
it.  Again, the extension of the line from the middle of the
river at that point to the bank, necessarily excludes that the
water of the river at any stage less than that which covers the
bed of it, was to be any guide for the line.

We think that the instructions given by the courts below
were erroneous.

Our interpretation of the first article of the cession made by
Georgia to the United States, is that the western line of Geor-
gia upon the Chattahoochee River, from its beginning in the
31st degree of north latitude to the great bend thereof, next
above the place where a certain creek or river called Uchee,
(being the first considerable stream on the western side, above
the Cussetas and Coweta towns,) empties into the said Chatta-
hoochee River, is a line to run up the river on and along its
western bank, and that the jurisdiction of Georgia in the soil
extends over to the line which is washed by the water, wherever
it covers the bed of the river within its banks.  The permanent
fast land bank is referred to as governing the line.  From the
lower edge of that bank, the bed of the river commences, and
Georgia retained the bed of the river from the lower edge of the

bank on the west side. And where the bank is fairly marked by the water, that water level will show at all places where the line is.

Mr. Justice NELSON.

This is a writ of error to the Supreme Court of the State of Alabama.

Ingersoll, the plaintiff below, and defendant here, brought an action against Howard for setting back the water of the River Chattahoochee upon his lands and mill by the erection of a dam across the said river, at the city of Columbus, in the State of Georgia, by reason whereof the operations of his mill were obstructed, and the use of his premises impaired.

The defendant pleaded the general issue.

On the trial, it appeared that the plaintiff was the owner of a lot of land held under a patent from the United States, situate on the west bank of the Chattahoochee River, in the State of Alabama, opposite the city of Columbus, and which lot had for its eastern boundary the State of Georgia.

This river has high bluff banks in some parts of it on both sides, in others, the banks are low, and the adjacent lands subject to inundations in high water, extending for nearly a mile from the bank. At the plaintiff's land the banks are from fifteen to twenty feet high on both sides, and somewhat abrupt, and above and below for some distance. The abrupt and high banks, however, on the plaintiff's side of the river do not extend down to the water's edge at ordinary low water. Between the high bluff and the water at this stage, the distance varies from fifty to one hundred and fifty feet; and this intermediate space is flat bottom-land, gradually descending from the base of the bluff to the water, and upon which flat grow trees, such as pines, oaks, gums, poplars, &c. Upon this flat, the plaintiff's grist-mill is built, and a road made along under the bluff leading to it. There is, also, a saw-mill and cotton-gin factory standing upon it. And a small portion of the flat is at times put under cultivation.

In the ordinary state of the river, in the winter season, the water covers this flat about half way to the high bluff, extending to the base of a bank or ridge of sand and gravel; and, in freshets, the water covers the flats reaching to the bluff. It is only in a full state of the river, or freshets, that the water overflows the sand bank or ridge before mentioned.

I have collected these facts from the two cases before us between these parties, each of which involves the same general question.

The plaintiff supplies his grist-mill with water by a wing dam extended obliquely into the river.

The defendant erected a dam across the river some three hundred yards below the plaintiff's mill, and opposite the city of Columbus. The dam is from four to five feet high; and at an ordinary stage of the river, the water is thrown back upon the plaintiff's mill so as to prevent its use. The defendant possesses a grant of the bed of the river upon which his dam is erected, derived from the State of Georgia, and extending to high-water mark on the western bank of the river.

The court charged the jury, that a person passing from the State of Georgia across the River Chattahoochee to the State of Alabama, at ordinary low water, would be upon the bank as soon as he left the water on the western side; and, that the line described in the treaty of cession from Georgia to the United States, as running up said river, and along the western bank thereof, is the line impressed upon the land by ordinary low water, to which charge the defendant excepted.

The defendant asked the court to charge, that, if the bank of the river was ordinary low-water mark, the plaintiff had no right to the use of the water at that stage, which was also refused, and an exception taken.

This case involves a question of much higher interest and importance than a simple decision upon the rights of these parties, as the court see that the decision cannot be reached without a determination of the boundary-line between two sovereign States, for a distance of some one hundred and fifty miles. The facts in the record are few, being confined to a description of the localities respecting this boundary at the point in dispute, and the few that are disclosed, very imperfectly and confusedly stated. It is to be regretted that the court is obliged to pass upon a question of this magnitude under these embarrassments, and in the absence of any opportunity, on the part of the two States interested, to furnish the necessary topographical information in respect to the river Chattahoochee and its western banks for the whole distance within which they constitute the boundary between them.

This information would have been useful to aid the court in a proper determination of the question, and would naturally have been furnished, if the controversy had been between the States themselves.

The words of the cession of Georgia to the United States, in 1802, describing the boundary-line in question, and which are material to be noticed, are as follows: — Georgia cedes the territory "west of a line beginning on the western bank of the Chattahoochee River, running thence up the said River Chattahoochee, and along the western bank thereof and the great bend;" and the United States cede to Georgia all their rights

to the territory lying "east of the boundary-line herein described
as the eastern boundary of the territory ceded by Georgia to the
United States."

This is the description of a line that has become the boundary
between Georgia and Alabama, for a distance of one hundred
and fifty miles.

Two constructions are contended for, arising out of the de-
scription: On the part of Georgia, it is claimed, that her boun-
dary extends to high-water mark, on the western bank of the
Chattahoochee River for the whole length of this line.   On the
part of Alabama, that it stops at ordinary low-water mark, on
the western bank of said river.

The difference is very material, as it will be seen, that upon
the former construction, Alabama can have a water or river
line for her boundary only during high water or a freshet, which
is but an occasional and temporary state of the river; and con-
sequently the owners of the land on the Alabama side, for the
greater portion of the year, and, for all practical use of the water
for agricultural or hydraulic purposes, would be deprived of a
river boundary.   And this difference is the more striking when
we see, from the evidence in the record, scanty and meagre as it
is, the strip of land between the high bank and the river, that is,
between high and ordinary low-water mark, would be from ten
to twenty and more rods in width, varying with the character
of the bank, which would belong to Georgia, or to the owners
on the Georgia side of the river; and over which the jurisdic-
tion and government of Georgia would necessarily extend to the
exclusion of Alabama.

We have no evidence, in the record, as to the distance the tide
ebbs and flows up this river.   It probably does not reach the
point where the boundary in question begins, which is at the
31st degree of north latitude.   It is navigable for steamboats up
to Columbus, which is within some thirty or forty miles of its
termination as a boundary between the two States; and, as I
am informed, is navigable above the great bend, or west point,
for small craft, for some one hundred miles, though interrupted
by rocks and falls between that and Columbus.

Grants of land, bounded by the sea or by navigable rivers,
where the tide ebbs and flows, extend to high-water mark, that
is, to the margin of the periodical flow of the tide, unaffected by
extraordinary causes, and the shores below common high-water
mark belong to the State in which they are situated.   But
grants of land bounded on rivers above tide-water, or where the
tide does not ebb and flow, carry the grantee to the middle of
the river, unless there are expressions in the terms of the grant,
or something in the terms taken in connection with the situa-

tion and condition of the lands granted, that clearly indicate an intention to stop at the edge or margin of the river. There must be a reservation or restriction, express or necessarily implied, which controls the operation of the general presumption, and makes the particular grant an exception.

These are familiar principles of universal application, governing the construction of grants of land bounded upon the sea or tide-water, or upon freshwater rivers, navigable or unnavigable, and whether made by States or individuals, or in large or small tracts. And in applying them to the description of the cession before us, we shall be enabled to determine where the boundary-line in dispute should be drawn. The words are, " beginning on the western bank of the Chattahoochee River," "running thence up the said River Chattahoochee, and along the western bank thereof."

Where land adjoining a freshwater river, or above tide-water, is described as bounded by a monument, whether natural or artificial, such as a tree or a stake standing on the bank, and a course is given as running from it up or down the river to another monument standing upon the bank, these words necessarily imply, as a general rule, that the line is to follow the river, according to its meanderings and turnings, and the grantee takes to the middle of the river. Such is the uniform construction given to this description where the common law prevails. It has been repeatedly applied to grants abutting on the River Mississippi, the Missouri, the Hudson, the Connecticut, and other great rivers in the United States, above tide-water. 3 Kent's Com. 427, 428, 429, and notes; Angell on Watercourses, c. 1, ed. 1850.

Had the description in this case been limited to the first two calls in the grant, it would have been impossible to have taken it out of this rule of construction; and the owners on the Alabama side would have been carried to the middle of the river. But the third call, which is, "along the western bank thereof," limits the effect and operation of the other two, and excludes the bed of the river. It indicates an intent to reserve the river within the boundary and jurisdiction of Georgia, and to confine the grantee to the western edge or bank. And this raises the material and important question in the case, namely, where shall that line be drawn? On behalf of Georgia, it is contended, it shall be drawn on the bank or bluff, as described in the record, at high-water mark; on behalf of Alabama, at the bank or ridge of sand and gravel, where the western margin of the river is found at ordinary low-water mark.

Now, it is to be observed, that the language of the cession, beginning on the western bank and running thence up the river and along the bank, does not necessarily, nor, as I think, reason-

ably, call for a line along the bluff or high bank, such as confines the body of water in the river at high water, or when swollen with floods. The bank inclosing the flow of water, when at its ordinary and usual stage, is equally within the description; and the limit within this bank, on each side, is more emphatically the bed of the river, than that embraced within the more elevated banks when the river is at flood. These are more or less distant from the ordinary channel, depending upon the character of the river and topography of the adjacent lands. There are usually in rivers of this description banks representing the point which is reached at high water and which bound it at that stage of the river. They may be, and not unfrequently are, at a considerable distance from the accustomed bed and the banks which then bound it. The flats intermediate may comprise the most valuable portion of farms, bounded upon the river and extending back to the uplands, notwithstanding they may be inundated by the spring and fall freshets. The valleys of the Mohawk, and Hudson, and Connecticut Rivers, may be referred to as illustrations, and also the Susquehannah, both in New York and Pennsylvania. Some of the finest alluvial bottom land in New York is found in the valley of the Mohawk, between the banks of the river at its usual stage and the banks at high water, which is the beginning of the uplands. If these alluvial bottoms are found in the valley of the Chattahooche, and for aught I know they may be, according to the boundary-line contended for by the plaintiff in error, the settlements within the State of Georgia would not be bounded by the river; as most valuable possessions for sites of towns, and for hydraulic and even agricultural purposes, might be found lying along its western margin.

I cannot think that it is necessary to occupy more time in attempting to refute the claim to this boundary-line according to the terms used in the cession by Georgia.

Then, if we leave the bank at what is called high-water mark, as not given by any reasonable interpretation of the grant, on what principle or rule of construction is an intermediate line to be drawn short of the ordinary and permanent bed of the river. It would be a boundary wholly undefinable, and designated neither by high water nor low water, nor by the usual stage, but left to vibrate between what is called high water and the accustomed bed of the river.

The term high water, when applied to the sea, or to a river where the tide ebbs and flows, has a definite meaning. The line is marked by the periodical flow of the tide, excluding the advance of waters above this line in the one case by winds and storms, and in the other by freshets or floods.

But in respect to freshwater rivers, the term is altogether indefinite, and the line marked uncertain. It has no fixed meaning in the sense of high-water mark when applied to a river where the tide ebbs and flows, and should never be adopted as a boundary in the case of freshwater rivers, by intendment or construction, whether between States or individuals. It may mean any stage of the water above its ordinary height, and the line will fluctuate with every varying freshet or flood that may happen.

In our judgment, the true boundary-line intended by Georgia and the United States, and the one fairly deducible from the language of the cession, is the line marked by the permanent bed of the river by the flow of the water at its usual and accustomed stage, and where the water will be found at all times in the season except when diminished by drought or swollen by freshets. This line will be found marked along its borders by the almost constant presence and abrasion of the waters against the bank. It is always manifest to the eye of any observer upon a river, and is marked in a way not to be mistaken. The junction of bank and water at this stage of the river satisfies the words of the cession, and furnishes a line as fixed and certain as is practicable; and is just and reasonable to all the parties concerned. It excludes the high bluffs or banks, which the river touches but occasionally, when swollen with freshets or floods; and also an intermediate line, which can be neither marked nor described; and adopts a boundary along the bank and margin of the river of some permanency, and which parties providing for a river boundary between them would naturally have in their minds. That they intended a river boundary in this treaty of cession I cannot doubt. That Georgia intended to reserve to herself the bed of the river is equally clear. The line which I have designated satisfies both intentions, and, in my humble judgment, no other boundary-line will.

There are some general considerations bearing upon the question which should not be overlooked.

This court observed, in the case of Handley's Lessee *v.* Anthony, (5 Wh. 374, 379,) through the Chief Justice, that "when a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one State is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly-created State extends to the river only. The river, however, is the boundary." "In case of doubt," says Vattel, "every country lying upon a river is presumed to have no other limits but the river; because nothing

is more natural than to take a river for a boundary when a state is established on its borders; and wherever there is doubt, that is always to be presumed which is most natural and probable."

Again the court say, " Even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion 'over the land on the other side which was left bare by the receding of the water. Wherever the river is a boundary between States, it is the main, the permanent river which constitutes that boundary; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low-water mark."

These views are sound and just, and the mind at once assents to them. And they apply directly and with great cogency to the question before us.

Let us now return to the case immediately under consideration. The court instructed the jury that the boundary-line described in the treaty of cession from Georgia to the United States, as running up the said river and along the banks thereof, was the line impressed upon the land by ordinary low water. I am not certain but that the line here designated, or rather intended to be designated, is the same that we have attempted to define in this opinion. " Ordinary low water," however, like " low water," is a relative term, and, in the abstract and without practicable application, has no definite meaning, and furnishes no satisfactory guide by which to ascertain or determine the line in question. I freely admit, that if the terms of the cession would justify the interpretation given to that of the territory north-west of the Ohio, I should greatly prefer the line adopted in Handley's Lessee v. Anthony, which was low-water mark.

But the call here for the bank seems necessarily to connect that with the river in defining the boundary, and restricts it somewhat to a greater extent than in the description of the line in the case mentioned.

As the general question involved is one of very great importance, and the ruling not necessarily conveying the instruction I think should have been given, I agree that a new trial should be granted.

The defendant requested the court to instruct the jury that, if the bank of the river was ordinary low-water mark, the plaintiff had no right to use the water at that stage, which was refused.

This instruction, we suppose, was asked for on the ground that, admitting the boundary-line to be fixed at ordinary low-water mark, inasmuch as the bed of the river within that limit

36*

belonged to Georgia, and the defendant's grant, derived from that State, authorized the erection of his dam to the height claimed, he had a right to set back the water up the bed within the aforesaid limit; and the complaint, therefore, that the back-water interfered with the supply of water to the plaintiff's mill, by obstructing the natural current of the river, was unfounded, as the defendant had a right, to this extent, to obstruct it. If this was the meaning of the instruction prayed for, there was error in the refusal.

Undoubtedly the plaintiff has no right, under his grant from the United States, to erect a dam in the bed of the river within the boundary-line of Georgia, for the purpose of supplying his mill with water. But I am not prepared to admit, that he cannot supply it by diverting the water upon his own land, without crossing the boundary-line, as by sinking a trench or ditch, if by so doing he works no injury to the rights of others. Every proprietor of land on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands. No proprietor has a right to use the water to the prejudice of other proprietors, above or below, unless he has acquired a prior right to divert it. He has no property in the water itself, but a simple usufruct while it passes along. Any one may reasonably use it who has a right of access to it; but no one can set up a claim to an exclusive right to the flow of all the water in its natural state; and that what he may not wish to use himself shall flow on till lost in the ocean.

Streams of water are intended for the use and comfort of man; and it would be unreasonable, and contrary to the universal sense of mankind, to debar a riparian proprietor from the application of the water to domestic, agricultural, and manufacturing purposes, provided the use works no substantial injury to others.

These principles will be found stated more at large by Chancellor Kent, in his Commentaries, (3 Kent's Com. 439, 440, 441); and also by Parke, J., in a very recent case in the Court of Exchequer in England, (Embry and another *v.* Owen, 4 Eng. Law and Eq. R. 466, 476, 477.)

Mr. Justice GRIER.
I concur with my brother Nelson.

Mr. Justice CURTIS.
In these cases I concur with the majority of the court in the opinion that each of the judgments should be reversed, but I withheld my assent from much of the reasoning contained in the opinion. I do so, because I am not entirely satisfied of its

correctness, as I apprehend its extent and bearings; and because the cases involve a question of boundary between the States of Georgia and Alabama, and highly important riparian and other rights connected therewith, or dependent thereon, in reference to which I desire to stand committed to no opinion, and to no course of reasoning, beyond what seems to me absolutely necessary for a final decision upon the private rights now before us.

This obliges me to state my own views of what I deem necessary to be decided, and the conclusions at which I have arrived. I shall do so very briefly, and without entering into an examination of the principles and authorities which have brought my mind to those conclusions.

My opinion is: — 1. That the calls contained in the act of cession, place the western line of Georgia on the western bank of the Chattahoochee River, at the place in question in these cases.

2. That the act of cession is silent as to the particular part of the bank on which the line is to be run. But inasmuch as it must be run on some particular part of the bank, we are obliged to resort to the presumed intentions of the commissioners and the parties, inferable from the nature of the line, as a line of boundary of political jurisdiction as well as of proprietorship, and, according to that presumed intention, we must declare it to be on that part of the bank which will best promote the convenience and advantage of both parties, and most fully accomplish the apparent and leading purpose to establish a natural boundary.

3. That the banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the banks, by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark, nor of ordinary low-water mark, nor of a middle stage of water, can be assumed as the line dividing the bed from the banks. This line is to be found by examining the bed and banks, and ascertaining where the presence and action of water are so common and usual, and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself. Whether this line between the bed and the banks will be found above or below, or at a middle stage of water, must depend upon the character of the stream. The height of a stream, during much the larger part of the year, may be above or below a middle point between its highest and least flow.

Something must depend also upon the rapidity of the stream and other circumstances. But in all cases the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present; the banks being fast land, on which vegetation, appropriate to such land in the particular locality, grows wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists when commonly submerged in water.

4. Taking along with us these views respecting the bed and banks of a river, it will be obvious that the lowest line of the bank, being the line which separates the bank from the bed, is a natural line, capable of being found in all parts of the river, impressed on the soil; and this is true of no other line on the bank; for though in some places the banks of a river may have so marked a character, that there would be no difficulty in tracing the upper line of the bank, and pronouncing, with certainty, that the bank there terminates, yet it is not to be supposed that this would be true throughout the course of a long river, and one of these cases finds, that in some places the banks of this river are low, and the adjacent lands on either side subject to occasional inundation. In such places it would be impracticable to fix on a precise line as the upper termination of the bank. Now, it is clear, that inasmuch as this line of the act of cession was to be a line of boundary of political jurisdiction, it must have been deemed by the commissioners when they fixed it, and by the parties when they assented to it, of great importance, to have a natural boundary, capable, not only of being ascertained upon inquiring, but of being seen and recognized in the common practical affairs of life. And, therefore, I am of opinion, that as the calls for this line do not expressly require it to be on any particular part of the bank, it should be located on the bank where the leading purpose, to have a natural boundary between the two jurisdictions, will be most effectually attained. The convenience and advantage of both parties require this. The line, therefore, is at the lowest edge of the bank, being the same natural line which divides the bank from the bed of the river.

The above brief statement of my views, while it exhibits all to which I have given my assent in these cases, will show why I concur in the opinion that the rulings, brought before us by these writs of error, were erroneous.

### Order in No. 121.

This cause came on to be heard on the transcript of the re-

cord from the Supreme Court of the State of Alabama, and was argued by counsel. On consideration whereof, it. is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Supreme Court to be proceeded with in conformity to the opinion of this court, and as to law and justice may appertain.

## Order in No. 131.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Georgia, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to award a *venire facias de novo*, and to proceed therewith, in conformity to the opinion of this court.